Okay, the next case is, this is computer science v. Gnosis S.P.A. Combined, number 141778, South Alabama Medical Science v. Gnosis S.P.A. and 141779, Merkin Company v. Gnosis S.P.A., Mr. Parther. Good morning, Your Honors, may it please the Court. My name is Thomas Parker, and I represent the appellant, South Alabama Medical Science Foundation, also referred to as SAMHSA, and our briefs. The patents at issue include your three patents, the 778, 915, and 381 patents. Your Honors, this morning we respectfully ask that the Board's obvious determination be overturned because the Board committed at least three legal errors. First, it failed to expressly articulate whether a person of ordinary skill in the art, at the time of the invention, would have had a reasonable expectation of success in combining Serpentine, excuse me, in Merasa. Second, the Board, in finding that the prior art did not teach against Serpentine and Merasa, and the Board data in certain of these prior art references. And third, the Board applied an erroneous legal standard in rejecting SAMHSA's objective evidence. Your Honor, with respect... I'll ask you the same question I asked the earlier counsel. If you had to pick your strongest argument, what would you pick? That the Board failed to expressly articulate a reasonable expectation of success analysis in support of their obviousness determination. Your Honors, even if all the limitations were met by the prior art in which the Board combined, and even under those circumstances, KSR, as well as this Court's precedent, requires that in an obviousness determination, that a reasonable expectation of success analysis be conveyed, especially in connection with cases that are acknowledged as unpredictable. There's no dispute with respect to the complexity and unpredictability of the subject matter of this case. In fact, both experts have agreed and testified that they were complex. And under those circumstances, there is no analysis that is provided. And even if it's somehow implicit or indirect in the Board's opinion, which we say it is not, which NOSIS agrees that there's no explicit analysis provided, that that still is not enough. Because this Court's precedent also makes clear, as well as KSR, that the obviousness analysis must be explicit. It must set forth those particular grounds and reasons for finding the claims obvious. So if the Board were to conduct a proper... analysis, the question would have been, would a person of ordinary skill in the art, in combining Serpentine and Meraza, where they had a reasonable expectation, for example, to be able to treat vascular disease, which is a claim element in the 1708 patent, by lowering that individual's homocysteine level. And the reason why I include homocysteine levels is because Serpentine, the reference, the main reference by the Board relied on, requires that the Serpentine reference is strictly directed to lowering homocysteine. And there's nothing in Serpentine which expresses treating any other condition independently of lowering homocysteine. And so the Board was not, or is not enabled to, when they were combining it, they mentioned there was a common purpose with respect to folate deficiency. But that's not what Serpentine is. It is a reference that teaches lowering homocysteine and requires it. It's a requirement of Serpentine. So that would have to be built into the RES analysis, reasonable expectation of success. And that wasn't done. With respect to... so to the extent that that was not done, and so the Board... so to Your Honor, Judge Plager's comment, that would be the one defense that we would choose to be... Now, I just want to just touch on other aspects of the case, teaching away. There are a series of references, Harpy 1 and Harpy 2, for example, which contain live data showing that if one were to administer what I would refer to as the 5-MTHF, the racemic version of 5-methyltetrahydrofolic acid, in its natural isomer, which I would refer to as L5, actually shows when you administer L5 to a patient who is unable to make L5, homocysteine levels are not decreased. They're actually increased. They actually go up, which is contrary to Serpentine, which Serpentine requires it to go down. And that data was ignored by the Board in this situation. The Board acknowledges the existence of Harpy 1 and Harpy 2 references with respect to stability, but did not take any consideration, or at least does not appear to incorporate that or take it into account in its analysis. And then there's another series of references, which we refer to as Horn, sometimes referred to Wagner. And we apply the Horn reference together with what's referred to as the Ulin reference. These two references are very significant, because they also teach away, they teach against, I mean, Harpy 1 and Harpy 2 would teach against combining Serpentine and Meraza, as would Horn and Wagner. For the reasons discussed in our papers, but just briefly, in order for the natural isomer L5 to be biologically active and to be retained in the cells for purposes of metabolism, it has to be polyglutamated. And what Horn shows is that when L5 is administered, it is not polyglutamated. And how do we know that? Because it's not metabolized. Because Horn shows that stage in the reference that it's not significantly metabolized. Now where the Board went wrong with respect to the Horn reference is that it relied on a particular aspect, because in our papers we were saying that L5 is a poor substrate for polyglutamation, and as a result, it's poorly retained, and it's not able to function. But the Board now, when the Board looked at the Horn reference, it said, well, look, it says here on A2073 in the second column, it says that 5-methyl is concentrated by the hepatocytes, the cells in the case. That's the two mechanisms by which liver may retain folate. But the problem there is that the Board wrongly assumed that what was being concentrated there was functional L5, a functional folate. The reference Horn makes clear that it is not significantly metabolized. In fact, their expert, Nelson's expert, even testified to the effect that he acknowledged that 5-MTHF is a poor substrate for polyglutamation, and as a result, there is a decrease, or there is no formation of functional folate. So the cells actually become deficient in functional folate. So it's unable to metabolize. If it's not being metabolized, then the whole process of converting homocysteine to methionine is not going to take place. But they did agree it was a metabolite, L5. L5 in its form, when you ingest folic acid and you go through all the cycles, there's going to be a formation naturally in the cells of L5. And that will be polyglutamated through the whole process, and then it will be converted into, it will help, it will donate the methyl group to convert homocysteine to methionine, correct. But what the Board didn't appreciate was the fact that Horn did not contradict Dr. Gregory's testimony or his opinions. In fact, Horn supported it. So it was a misinterpretation of the reference because there's nothing in this reference suggesting that any of the material that was concentrated in the cells was actually a functional form of folate. It actually supported the opinions of Dr. Gregory that directly administered L5 and 5-MTHF are poor substrates for polyglutamation. And therefore, they don't, without that, they're not biologically active, and without that, they're not retained in the cells. So all the while, when we're referring to accumulated L5 in the cells, we're referring to functional L5 because it would not make any sense to be relying on Horn for a proposition that we were looking to Horn to show the accumulation of non-functional folate. So that's where the Board erred in that respect. And then we have also the Board rejected Dr. Miller's testimony. When he described and he conceded this whole notion about directly administered 5-MTHF in this particular case would not be a poor substrate for polyglutamation and therefore would not be able to form functional folate. The Board rejected that testimony on the grounds that the deposition testimony itself was really directed to his statement as of the day the deposition was taking place, which was May 6, 2013. But that was incorrect because if you look at the transcript, the predicate, the foundation of the time frame was clearly set out from the time period of 1995 to 1996. It was handed an exhibit. The exhibit and the line of questioning dealt with folic acid, and it continued. So it's clear that the time frame was established, and he was testifying not as of May 6, 2013, but at one of Ordinary School in the Art prior to the 1995-96 time frame. So the Board erred there as well, and as such, with respect to the proposition that Horn, together with Heumann, taught against combining surf and genome metabolism. The Board either ignored or the Board misapprehended the evidence that was submitted. Okay, now with respect to secondary considerations, the Board rejected all of SAMHSA's objective evidence. And for various reasons. First, the Board took the position that we failed to tie the – and in this particular case, the secondary considerations, for example, commercial success, was based upon the sales of products that were sold by a company called Pameline. The Board took the position that we did not tie the products, the components of the products, to any particular claim element to tie into the commercial success. What was their reason for saying there was no tie? They were not willing to accept what you proffered, I assume, that it is the product itself that is sold? The problem was the Board used the word novel element in the claim. We failed to tie the evidence to a novel element in the claim. There is no individual novel element. What we have is a novel combination of elements that were known in the prior art. And so that was the problem with the Board's rationale. We, in fact, tied the evidence, which is – you see the products are a combination of vitamins. And we tied the elements, which the claim is directed to reduce folate and one or more vitamins. And we tied all that together in the form of six declarations by six experts. And so the notion of tying it to a novel element just doesn't work when you have a novel combination of prior art elements. So that was one of the reasons, one of the grounds. And that was a mistake on the part of the Board. Also, the Board seemed to be requiring that the claims have to explicitly recite the specific vitamins – the vitamin combinations or the specific ingredients exactly as they appear in the product, when, in fact, that is not a requirement. I mean, the claims are certainly broader than the products, and that's fine. In fact, under this Court's precedent, that seems to be the case when you're introducing objective evidence. You don't have to show objective evidence for every conceivable embodiment under the scope of the claim. In another aspect as well, the Board rejected the evidence requiring SAMHSA to show evidence that other embodiments within the scope of the claim would have behaved the same as the PAMLAB products. That we had to provide evidence showing that they would have – other undefined embodiments would have behaved the same as each of the five PAMLAB products that we were working with. And that is not a requirement under any of the case law, at least that I'm aware of. And what the Board did, to put it all together, is there were references to the word unique with respect to some of our witnesses' statements in the declarations. But this word unique was – and then the Board took the word unique to say, well, you are implying that these – that the combinations of the specific vitamins used in the PAMLAB products are so unique that no other embodiment within the scope of the claim would behave the same as these products. Well, that's just not a reasonable interpretation of the testimony and I think it speaks for itself. And for example, he cites to Mr. Ladner, who was the Senior Vice President of PAMLAB, and when he was referring to the word unique, he was just making a comparison to the market in terms of conventional drugs, which are usually chemical entities, versus what we have here, which is referred to as medical foods, vitamins, which are exempt from the Hatch-Waxman Act. So the word unique does not at all justify the sweeping conclusion by the Board that somehow these statements by themselves would stand for a proposition that every conceivable embodiment under the scope of the claims would not behave the same as the PAMLAB products. So in that particular – in that regard, the Board rejected all of Sam's subjective evidence and we believe that that is – that was error, that is not the – does not follow this Court's precedent. In fact, it just required a way much too stringent – it imposed a much too rigorous requirement for establishing the nexus with respect to the commercial success, the licensing, the copying, the industry praise, the long-felt need. I mean, there's an abundance amount of objective evidence that we submitted to each of these five products. I mean, this case is a little bit atypical. We have five different products. What's our standard of review for all of those underlying facts coming from the Board? So the standard review would be substantial evidence for the factual findings. Obviously, the legal conclusion of obviousness would be – This whole case is based on an accumulation of a variety of factual determinations, is it not? No, I mean, the underlying case, surely. But the gist – To which we have to give deference under the most substantial standard that exists, which is if there's substantial evidence in that record, we're bound. You agree with that? I agree that that is – you're absolutely correct, that is the standard. But what we're saying here is the Board applied the wrong legal standard to the facts. We were just talking about factual issues. What's the wrong legal standard? The wrong legal standard. Requiring that a claim has to recite the specific embodiment exactly. That is not the requirement for establishing a nexus. That the products have to behave the same across the Board of the range of the claim. That is not a legal – that is not a requirement under this Court's precedent for establishing a nexus. You're getting all this from your interpretation of the Board's explanation of what it did? Yes. Okay. Yes, and that's quite apparent from the Board. Because they also cite the case of In re Co. And they focus on the section of In re Co. dealing with unexpected results. Now, unexpected results has a little bit – it does have an obligation to show that you have to show the unexpected results across the range of the claim. But that's not so, for example, for commercial success. And there are a number of cases that this – from this Court which says that you don't have to show commercial success featuring every embodiment under the scope of the claim. So that's what we're essentially saying, Your Honor, is that it was a wrong – it was an improper legal – they did not properly apply the precedent of this Court as we laid out in our papers. So if they were a little more careful in how they'd written it, we wouldn't – you wouldn't be up here. That's correct, Your Honor. That's absolutely correct. If they were to follow the – if they were to follow this Court's precedent – Even with the same result, since it's all fact-based. Excuse me, one more. Even if they reached the same result, which is all fact-based, had they written it more carefully, you wouldn't be up here. I would like to think not. I mean, if they applied the case law correctly, I would like to think they would have come to the conclusion that the claims were not obvious or that they would have given due weight, significant weight to the evidence of commercial – to the objective evidence. Well, they're required to consider the objective evidence, the secondary considerations, as a matter of law. That is correct. Are they not? That's correct, Your Honor. That's correct. And just another example as well is we have – we provided evidence of industry praise. And it was rejected because the Court found that it was not tied – that it was tied to just the L-5 and not the combination and said, well, the L-5 is a prior art element. I mean, that is a situation where perhaps maybe a factual issue, but when you read the declarations as we cite in our papers, it's not – it's just not the case. They clearly – the experts clearly associate the industry praise with the invention – claimed invention as a whole, not with respect to one vitamin. Now, I reserve three minutes of time. Well, are the issues any different between the university and Merck? Perhaps it would make more sense to continue with your argument in chief and with your rebuttal in chief. Yes, Your Honor. There are overlapping – Are the issues different? There are – there are some issues that are different. There are. For example, anticipation, claim construction, and the way in which the Board handled the objective evidence. Okay. Otherwise, the prior art is essentially the same. Well, in that case, let's hear from the other side on the first appeal. Okay. Okay, Mr. Swick. Good morning, Your Honors. My name is Joe Swick. I'm here on behalf of the Appellee's Gnosis. In this case, I'd like to address some of the comments that my opposing counsel just made to the court. First point he talked about was the fact that  expectation of success. And I will concede that in the final written decision, there is no expectation of success. There is no specific expressed language talking about the reasonable expectation of success. Those words are not in the opinion. However, it's clear to us that the Board did engage in that analysis, and that is evidence in the actual opinion itself. The way the Board expressed its belief that there would be a reasonable expectation of success is that it talked about – and this is on page 837 of the record – that the serpentine reference calls for a suitable active metabolite of folate in an oral preparation. It uses those words. And then after looking at those words of what serpentine calls for, which is a suitable active metabolite, the Board takes the next step and looks at the mirasa reference, which I also relied upon, and says, that's it. Mirasa is raising its hand. Mirasa is saying, I am the suitable active metabolite. I am the 6S5MTHF. It isn't just that the L5 might be a suitable metabolite as far as the reasonable expectation of success. Doesn't there also have to be a reason for selecting L5 to start with? There does have to be a reason for selecting the L5 as well, and the mirasa reference absolutely did talk about that and the Board recognized the reason that one would pick the L5MTHF among the suitable active metabolites. The mirasa reference talks about how the L5 is going to be useful for vitamin therapy as an active metabolite of folate. It then talks about the distinction between the L5, the 6S isomer, and how that is different than the 6R isomer. I'll tell you what troubles me in this, what looks like a hindsight. Here we have years, decades, of an appreciation of the role in metabolism of this vitamin. And without this step, this selection, until these scientists came along. Well, Your Honor, I think it's clear that the 6S L5 isomer was seen as the most promising isomer of the eight reduced folates that are in the metabolite cycle that happens with folic acid. Well, the idea of selecting an isomer or selecting a metabolite seems to be something that was not particularly present other than perhaps as a scientific curiosity. Well, Your Honor, I think mirasa really did solve the problem of figuring out which of the eight isomers would be believed to be the most useful. And mirasa is the one who says after he comes after serpentine and raises his hand and says, here it is, the 6S L5. But how do you get from serpentine to mirasa? You would assume that mirasa discloses that. Where is the board's analysis on the motivation to combine those two? The motivation to combine the, and that was an argument that was not in the, they did not raise that argument in this appeal, but they did raise that argument in the other appeal. And the motivation to combine the board did find it in page 823 in the 1779 Merck Appeal. And the board found that the close similarity of purpose and disclosure between these references talking about serpentine mirasa provides sufficient rationale for one and nor in their skill in the art to have combined them. And it cites KSR. And before it gives that statement of law it talks about how serpentine was there to correct folate deficiency and treat diseases associated with elevated levels of homocysteine. And then it recognizes that mirasa is disclosing the same purpose and disclosure by stating that mirasa specifically identifies a Carly Pure L5 MTHF as an active metabolite of folate and suitable for use as a therapeutic agent in folate deficient states. And that's a quote from the board and that's on page 823 in the 1779 appeal when it's expressly addressing the motivation to combine. So that's for the motivation. But this needs to be the board's own reasoning about why it would combine. I mean instead of looking at the actual evidence that some person of ordinary skill would have combined. Is there a distinction there? Your Honor, I think the actual evidence is in the references themselves. I mean is there a reference that says you know explicitly that mirasa say okay so is this more in your line you think this is the board's conclusion that a person of ordinary skill looking at these two references would have found enough that they would have combined serpentine and mirasa just based upon the closeness of the references. Correct. And based on the similarity of the purposes of which they were both you know designated for and the actual disclosures within the references themselves. Counsel raised the issue of the Harpe references and the primary argument they made with respect to the Harpe references is he talked about the effectiveness but down to be stable enough. And what the board correctly recognizes that well Harpe did express some concerns about stability in that time period but then the board recognized that after Harpe came the Godfrey reference came the Reggie reference came the Patini reference which all found that the 5 MTHF was suitable and stateable enough to therapeutically treat. So the board correctly recognized that whatever concerns Harpe had in the beginning those concerns had been overcome in the arts prior to the invention through those three references. With respect to the Horne and Wagner Uellen argument that council made that argument had a long factual basis they first started their argument by saying well those references teach away because L5 MTHF is a poor substrate for polyglutamation. Then we did the depositions and the both experts said well actually you know folic acid is just as bad for the substrate activity for polyglutamation and then we presented them with the Chikwe reference which showed folic acid was actually a worse substrate than the 6S5 MTHF and therefore we thought Wagner and Uellen could not be a teaching away. Then the argument morphed into they said well what we're really saying is it's the amount of the L5 MTHF that's retained in the cells that's what's important and the Wagner shows that there was really no accumulation of the L5 MTHF in the cells themselves and the oral argument the board the board confirmed this and said well actually Wagner does say that some L5 MTHF is within the cells isn't that correct? And that's what the board found in fact that's what Horne and Uellen I mean Horne and Wagner do show so then their argument really morphed into well okay L5 MTHF is just as bad of a poor substrate it is retained in the cells but it's the amount of L5 MTHF in the cells that can be metabolized and that's what Wagner shows well and the board addressed that and said no that's not on a factual basis what Wagner is teaching is that some of the L5 MTHF is being metabolized and Wagner is being conducted in a in vitro experimental type condition there's no evidence in the record that that experimental result would translate into a similar result in vivo in the humans so we're not going to accept that evidence as persuasive teaching away and also they recognize that to the extent that Wagner and Horn say that the L5 MTHF is not significantly metabolized in the cells metabolized was never defined by the Merck experts or the SAMHSA experts so it's really just unpersuasive metabolized was never defined what do you mean the word metabolized right the words in the dictionary isn't it the word is in the dictionary right but the word has probably a very scientific meaning and the problem is there was no scientific basis or expert opinion of what metabolized means in the context of what Horn and Wagner were talking about in experimental conditions maybe I misread the record but the whole thing is about metabolites and selection of metabolites and how many metabolites and how many variations right right and that's our contention that it is one of the where was the lack of I cannot and that's the problem there was not expert testimony of what metabolization means in the context of that experimental test you're saying that in this case the word has a different meaning from the ordinary common meaning of metabolite is there any doubt when they say that there are 8 primary metabolites what they're talking about there's no doubt as to what those 8 metabolites are in the folate cycle that is moving around there's unquestionably I just want to understand your argument I'm sorry I want to understand the argument that you're making about metabolite not being defined right right well I'm just recognizing that the word metabolization meant in the context of one sentence that was cherry picked out of the horn and Wagner reference and it asked counsel I believe that oral argument that's my recollection what does that mean and no one was able to define it at the board's hearing so if they're able to come forward and explain what it means I don't think it's my duty to prove what their teaching away reference means and what the experimental result meant in a teaching away counsel I take it you handled this before the board yes co-counsel actually split it correct all four of the cases correct your honor it was they were split into two similar to this one we had three Bailey patents and one oral argument and then we had the Merck patent a separate oral argument all on the same day in consecutive order too so and you never objected to the absence of definition of metabolite until now I don't recall your honor I really don't recall if I objected to that or not I think it was something the board your case doesn't turn on that issue it really does not turn on that issue at all I mean because this is one teaching away that they're saying well this would have dissuaded a person with an ordinary skill in the art from ever using an L5 MTHF because of this experimental result this is one experimental result contrast that to we have Serpentine saying use a suitable active metabolite to lower homocysteine we have Miraza saying here I am I am the suitable active metabolite it's the best one out there this is the one you want to use we have Godfrey actually using 5 MTHF in experimental conditions and getting good results in treating depression we have Reggie who's using an actual 5 MTHF it's a product that's made by BioResearch Milan Italy he's using that we have Patini who's using it to treat bicyclists in the Alps mountains who have insufficient folate and he's giving them iron and the 5 MTHF so if in fact this one experimental result about there's a question as how well the L5 MTHF is retaining the cells and metabolize why do we have this avalanche of evidence of all these other people actually using 5 MTHF and we have Serpentine and Miraza all suggesting that this is the way to go so it is one teaching too much evidence are you saying they provided too much evidence or not enough evidence not enough I mean on this teaching away there's substantial evidence in their mind of why this reference was simply just not a persuasive reference regarding the secondary factors first of all counsel suggested that the board took a strict test and said that well we're looking for what the novel element is in the claims and it's a single novel element and unless the commercial success or the secondary evidence is tied to that novel element then you know we're going to reject it first of all they didn't ever reject any of the secondary evidence but they said the secondary evidence was tenuous at best so it wasn't a wholesale rejection as counsel has implied but also on you know it's clear to me that the board did not limit its analysis to looking for only a single novel element as opposed to the claim as a whole because what we see on page 840 of the record which is the page 40 the final written decision for the 915 patent it says the particular combination of active ingredients in any of the PAMLAB products is not recited as an element or combination of elements of any claim under review as such the objective evidence for each product lacks a clear nexus with the claims so here it's clear to me that by saying that any element or combination of elements the board is correctly considering the claimed invention as a whole it's looking if indeed there is any novel element it's not finding any counsel just told us that there are no specific novel elements they say the claim is novel because it's claim as a whole is what's novel but here we see the board actually did consider the combination of elements as well and expressly said that it was looking at that as well and you know counsel makes the point over and over again that you know well they don't have to prove that every single embodiment within this very broad scope of claims is tied to the secondary evidence and that's it's never been our position and it was not the board's position that 100% of the embodiment within a specific claim needs to be attributed to the commercial success but there has to be a nexus there has to be a reasonable tie to the amount of products that fall within the claim and how they relate to the claims as a whole because here in this case in the Bailey patents we have very broad claims covering the success 5MTHF and any combination of any vitamin any mineral so in my mind the claims are as broad as a swimming pool where every one of these embodiments is a specific marble within this swimming pool and what SAMHSA did is we got 5 or 6 SAMHSA products and these are our 5 or 6 marbles we've made them they have specific uses they have specific vitamin combinations and our 5 or 6 marbles we're going to throw them into the swimming pool that's the claim as a whole and the fact that we can show 5 or 6 of these marbles within the entire swimming pool is successful and the objective evidence should be tied to the entire swimming pool full in this case the Boar Town it was a very very small subset of embodiments that they presented on evidence as it relates to the claim as a whole so for them to find that the secondary evidence was tenuous I think there's substantial evidence in the records that support their finding on that okay I think that as far as let's hear the rebuttal on the university's appeal and then we'll proceed with the other case and the remaining issues thank you your honor with respect to the requirement that the board make a finding of reasonable expectation of success let me just cite just for the court's benefit I'm sure I know I understand the courts are aware of this case perfect web 587 of 13-24 13-29 where there citing to KSR the court said with respect to obviousness to facilitate review this analysis should be a reasonable expectation of success analysis into the term suitable even then I don't think that that would be considered to be an explicit analysis a reasonable expectation of success in fact the word suitable wasn't really defined in this case and the board did not adopt any particular definition of the word suitable but our view was that it should be made explicit to facilitate review correct assuming we can review a matter without it being explicit there's no error on that issue is there to the extent that it was either an indirect or implicit I'm not aware of a situation where that would be so especially in a situation we have a subject matter which is so in terms of what the basis was and what would be our recourse to that extent if we weren't even able to discern what the RES analysis was done if it was done indirectly or implicitly and you're going back and forth different pages  now with respect to the Harpy references Gnosis was they were the ones that raised Harpy to establish that it taught but the problem with Harpy is even if we agree with you that they teach away there's a whole bunch of other references that the board relies on to say they don't so on this very deferential substantial evidence review it doesn't matter what Harpy says it matters what the other ones say doesn't it there's two classes of references the ones that they were just referring to there's a whole slew of them that were not even addressed in the board's decision no factual findings were made for example Godfrey I'm sorry not Godfrey there are other references I can't name right now but there's a series of references that were not relied upon in the board's decision so it's tough to now come forward and say well this reference teaches you know toward the invention for example Godfrey at the very end of Godfrey he concludes he has no idea why this works doesn't understand the mechanism of action doesn't understand if correcting fully is efficient but we're not the fact finder all we're looking at is whether there's substantial evidence as long as we find one of those references that doesn't teach away isn't that substantial evidence to support the board's conclusion but then again if we go back to Harpy though I mean Harpy is live but that's the problem we don't have to go back to Harpy it doesn't matter what Harpy says as long as there's enough evidence to support the other conclusion agreed but now Harpy in addition to the horn and everything else we've laid out would suggest that these other references do not say anything about lowering homocysteine they don't tell you anything about the uptake of what's going on we know there's the uptake but there's substantial evidence but where is the uptake and why specifically you're going to lower homocysteine that is not in the record there's no prior art teaching that the references he cited do not teach that and that would not be substantial evidence at all and by the way they don't offer a single expert a single expert to discuss those references which also makes it a little bit more difficult because now it's just a turning argument that's being argued so the metabolism that was not ever in dispute the word metabolism it was it was clear I mean the references the horn references shows metabolism is the L5 it's radio labeled there was I'm not sure where that came from but that was not something that we were had a problem with or anyone had a problem with during the oral argument and with respect to the secondary evidence although not required Gnosis did not provide or put forth an expert to rebut any of the experts in that respect all they provided in essence is an attorney argument they didn't address the market they didn't have an expert addressing the market an expert addressing the long felt need or an expert addressing the commercial sales and putting it in perspective and so then turning to substantial this is not in a sense a case of substantial evidence let me just it really is primarily the an application of the law by the board that was incorrect with respect to secondary considerations that is the heart of what we're saying versus the facts itself okay can we proceed to the second case or are there anything else that you need to tell us in rebuttal in a sentence or two yes there is just one more point okay we have it okay we will